# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| JARROD TAYLOR, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:25-cv-00678-RAH |
| | ) |
| JOHN Q. HAMM, | ) |
| Commissioner, Alabama | ) |
| Department of Corrections, | ) |
| | ) |
| and | ) |
| | ) |
| TERRY RAYBON, Warden, | ) |
| Holman Correctional Facility, | ) |
| | ) |
|     Defendants. | ) |

## DEFENDANTS' MOTION TO DISMISS

Steve Marshall
*Attorney General*

Polly S. Kenny
*Assistant Attorney General*

Lauren A. Simpson
*Deputy Attorney General*

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
Lauren.Simpson@AlabamaAG.gov

October 3, 2025

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

STANDARDS OF REVIEW ..................................................................................4

PRISON LITIGATION REFORM ACT.................................................................4

BACKGROUND ...................................................................................................5

    I.    Taylor's crime, litigation, and election of nitrogen hypoxia. ...............5

    II.    Adoption of nitrogen hypoxia and subsequent litigation......................8

        A.    Kenneth Smith....................................................................9

        B.    Alan Miller .........................................................................9

        C.    Carey Grayson...................................................................10

        D.    Demetrius Frazier..............................................................12

        E.    Gregory Hunt ....................................................................13

        F.    Geoffrey West ...................................................................13

        G.    Jessie Hoffman (Louisiana) ..............................................14

ARGUMENT .......................................................................................................15

    I.    Count I (Eighth Amendment) should be dismissed for failure to
        state a claim. ......................................................................................15

        A.    Law of method-of-execution claims. .......................................16

        B.    Taylor does not plausibly allege a substantial risk of severe
            pain in Count I..........................................................................18

        C.    Defects of Taylor's alternative methods of execution cause
            Count I to fail as a matter of law...............................................25

II.    Count II (state-law constitutional challenge) should be dismissed
for failure to state a claim....................................................................31

III.    Count III (Due Process) should be dismissed for failure to state
a claim. ................................................................................................35

CONCLUSION ....................................................................................................37

CERTIFICATE OF SERVICE ..............................................................................39

# INTRODUCTION

Jarrod Taylor was sentenced to death in August 1998 after he was convicted of four counts of capital murder for the deaths of Sherry Gaston, Bruce Gaston, and Steve Dyas. *Taylor v. Dunn*, 1:14-cv-00439, 2018 WL 575670, at *2 (S.D. Ala. Jan. 25, 2018). His conventional appeals were exhausted in May 2019 when the United States Supreme Court denied certiorari in his federal habeas proceedings.

On June 28, 2018, Taylor timely elected nitrogen hypoxia as his method of execution. The Alabama Department of Corrections (ADOC) did not announce a nitrogen hypoxia execution protocol until late August 2023; the present 42 U.S.C. § 1983 complaint, filed on August 22, 2025, came in just prior to the end of the two-year statute of limitations period for personal injury actions. *See* ALA. CODE § 6-2-38. Another seven of Taylor's fellow death row inmates filed § 1983 complaints in the Middle District of Alabama on the same day, alleging similar grounds for relief; one chose to file in state court.

As of this filing, ADOC has carried out six executions by hypoxia: Kenneth Smith, Alan Miller, and Carey Grayson in 2024, and Demetrius Frazier, Gregory Hunt, and Geoffrey West in 2025. A seventh execution, Anthony Boyd, is scheduled for October. Louisiana executed Jessie Hoffman using this method in 2025. The method of execution is fairly simple. The condemned, wearing a full-face respirator and restrained to a gurney, starts by breathing a mix of gases known as "breathing

1

air" that resembles the ordinary atmosphere. To begin the execution, the breathing air is shut off and replaced by nitrogen, and within seconds, the oxygen level within the mask plummets to the point that the condemned loses consciousness and eventually succumbs. Defendants maintain, based upon the best-available science and evidence, that hypoxia is a quick and painless method of execution, and that the reported movements and "gasping" of the condemned, *see, e.g.*, DE1 ¶66, are merely unconscious movements and agonal breathing, respectively—expected and not indicative of pain or consciousness. Indeed, for well over a year now, inmates (and their experts) have pointed to Smith's so-called writhing and struggling to support claims of cruel and unusual "conscious suffocation." They have claimed that nitrogen hypoxia causes unconstitutional emotional distress. And they have pointed to dicta in *Baze v. Rees*, 553 U.S. 35 (2008), to suggest the United States Supreme Court has already decided the issue. But those claims have resoundingly failed in federal court, including in appeals to two different courts of appeals and in the Supreme Court.

Taylor argues six claims for relief:

- Nitrogen hypoxia is cruel and unusual under the Eighth and Fourteenth Amendments, DE1 ¶¶175–99,

- Nitrogen hypoxia violates Taylor's right to be free from cruel or unusual punishment under Article I, section 15, of the Alabama Constitution, *id.* ¶¶200–05, and

- Taylor's due process rights have been violated because he has not been

given the unredacted protocol, *id.* ¶¶206–16.

He asks the Court to declare the protocol unconstitutional under the United States and Alabama constitutions, to enjoin Defendants from executing him via nitrogen hypoxia using the current protocol and from executing him using any method other than one of his stated alternatives, and to give him an unredacted copy of the protocol. *Id.* at 48–49.

Taylor's complaint is due to be dismissed. ***First***, Taylor's Eighth Amendment claim is largely built on media accounts, *see id.* ¶¶71–122, which Chief Judge Marks deemed "unreliable evidence" in another hypoxia § 1983 action, *Frazier v. Hamm*, 2:24-cv-00732, 2025 WL 361172, at *11 n.19 (M.D. Ala. Jan. 31, 2025). The State has ample penological reason to reject his alternatives—either nitrogen hypoxia with intravenous midazolam or an oral dose of a medical-aid-in-dying (MAID) cocktail (secobarbital or DDMP II). ***Second***, Taylor's state-law claim is meritless, and this Court should decline to exercise supplemental jurisdiction. ***Third***, as to Taylor's due process claim, "the Eleventh Circuit has held that death row inmates do not have a due process right to disclosure of a state's execution protocol because there is no cognizable liberty interest in such information." *Woods v. Dunn*, 2:20-cv-58, 2020 WL 1015763, at *12 (M.D. Ala. Mar. 2, 2020) (citing *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1293 (11th Cir. 2016); *Wellons v. Comm'r, Ga. Dep't of*

*Corr.*, 754 F.3d 1260, 1267 (11th Cir. 2014)). For the reasons that follow, this Court should dismiss the complaint.

**STANDARDS OF REVIEW**

A Rule 12(b)(6) motion tests the complaint against Rule 8's requirement of a statement "showing that the pleader is entitled to relief," as defined by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007). A court accepts only well-pleaded facts as true and is not bound by a plaintiff's legal assertions. *Iqbal*, 556 U.S. at 678. A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* The complaint must plead "factual content" sufficient "to draw the reasonable inference that [each] defendant is liable." *Id.* Allegations must be more than "speculative," *Twombly*, 550 U.S. at 555, and raise "more than a sheer possibility" of unlawful action, *Iqbal*, 556 U.S. at 678. There is a "line between possibility and plausibility," and "facts that are merely consistent with a defendant's liability…stop[] short." *Id.* (citation modified).

**PRISON LITIGATION REFORM ACT**

Taylor seeks prospective injunctive relief in the form of an order enjoining Defendants from executing him using the nitrogen hypoxia protocol. DE1 ¶¶123–24. The Prison Litigation Reform Act (PLRA) requires that any grant of injunctive relief be "narrowly drawn, extend no further than necessary to correct the harm the

court finds requires preliminary relief, and be the least intrusive means to correct that harm." 18 U.S.C. § 3626(a) (2024). Should it grant injunctive relief, a district court is required to perform this narrowness-necessity-and-non-intrusiveness analysis as to each separate form or basis of injunctive relief and explain its findings. *See Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1279 (11th Cir. 2020) ("[For] 15 separate forms of relief, the court must make—and explain—15 separate PLRA-related findings.").

The Supreme Court has identified the PLRA's "substantive and procedural limitations" as tools "to streamline 1983 actions and protect 'the timely enforcement of a sentence.'" *Nance v. Ward*, 597 U.S. 159, 174 (2022). The PLRA underscores that this Court must give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system" that would be caused by granting Taylor the prospective relief he requests. 18 U.S.C. § 3626 (2024).

## BACKGROUND

## I.    Taylor's crime, litigation, and election of nitrogen hypoxia.

The following is taken from the Alabama Court of Criminal Appeals' (ACCA) recitation of the facts of Taylor's crime. *Taylor v. State*, 808 So. 2d 1148, 1160–61 (Ala. Crim. App. 2000).

On December 12, 1997, Jarrod Taylor and his friend Kenyatta McMillan took a pistol from the home of another of Taylor's friends and bought a BB-pellet pistol

at Walmart. The two planned to rob Steve Dyas Motors, a used car dealership in Mobile. To that end, Taylor pretended to be interested in buying a Mustang, test-driving the car, filling out paperwork, and negotiating the price with Sherry Gaston. Taylor claimed that his father-in-law was coming up from Louisiana to buy the car for him as a Christmas present.

The two men visited the car dealership several times that day. By dusk, the only employees left were Sherry, her husband Bruce Gaston, and Steve Dyas himself, as everyone else had left for the company Christmas party. Taylor and McMillan walked in, and Taylor shot Bruce in the chest. Sherry locked herself in the bathroom, while Dyas tried to flee out a window; McMillan caught him and brought him back, and Taylor shot Dyas in the head as he was on his knees, begging for his life. Taylor then ordered Sherry to come out. She opened the door and begged to be spared, telling the men she had two children. Taylor shot her in the head. The two took Sherry's purse and the men's wallets, plus paperwork for the sale of the Mustang. Noticing Bruce move on the way out, Taylor shot him in the head as well. They drove the stolen Mustang to Selma, where they were soon apprehended.

Taylor was indicted for four counts of capital murder in Mobile County in April 1998 and went to trial that August. The jury convicted him of all four counts but recommended life without parole by a 7–5 vote. The trial court, however, overrode this recommendation and sentenced Taylor to death. *Taylor*, 2018 WL 575670,

6

at *2.

ACCA affirmed in 2000, *Taylor*, 808 So. 2d at 1215, as did the Alabama Supreme Court, *Ex parte Taylor*, 808 So. 2d 1215 (Ala. 2001). The United States Supreme Court denied certiorari. *Taylor v. Alabama*, 534 U.S. 1086 (2002) (mem.).

Taylor sought postconviction (Rule 32) relief in July 2002. After an appeal concerning foreign counsel, the circuit court denied relief after an evidentiary hearing in 2012, and both ACCA and the Alabama Supreme Court affirmed. *See Taylor*, 2018 WL 575670, at *5.

In September 2014, Taylor initiated federal habeas proceedings in the Southern District of Alabama. His petition was denied in 2018, *id.* at *77, and the Eleventh Circuit denied a certificate of appealability, *Taylor v. Ala. Dep't of Corr.*, No. 18-11523-P, 2018 WL 8058904 (11th Cir. Oct. 5, 2018). Again, the Supreme Court denied certiorari. *Taylor v. Dunn*, 587 U.S. 986 (2019) (mem.).

In March 2018, nitrogen hypoxia was added to Alabama's statutory methods of execution, and inmates like Taylor had a thirty-day period that June in which they could affirmatively elect the new method. *See* ALA. CODE § 15-18-82.1(b)(2). Taylor did so on June 28, 2018.

As of this filing, the State of Alabama has not moved for Taylor's execution to be set.[1]

## II.    Adoption of nitrogen hypoxia and subsequent litigation.

In August 2023, ADOC adopted a protocol for carrying out judicial executions by nitrogen hypoxia. The "crux" of the protocol is that it administers "pure nitrogen gas…through an industrial respirator mask" until the inmate dies. *Grayson v. Hamm*, 2:24-cv-376, 2024 WL 4701875, at *2 (M.D. Ala. Nov. 6, 2024). EKG machines and pulse oximeters monitor the inmate's condition. *Id.*

Alabama has successfully used nitrogen hypoxia to carry out the sentences of Kenneth Smith (Supreme Court denied stay), Alan Miller (settled), Carey Grayson (Supreme Court denied stay), Demetrius Frazier (did not appeal denial of preliminary relief), Gregory Hunt (did not challenge the method), and Geoffrey West (did not challenge the method). Louisiana used a similar hypoxia protocol to execute Jessie Hoffman (Supreme Court denied stay after Fifth Circuit vacated preliminary injunction).

---

1. The State sought an execution date for Taylor in July 2019, as ADOC had somehow not received a copy of Taylor's election notification and believed he had opted to stay with lethal injection. Following discussion with Taylor's counsel, the State withdrew the motion a few days later.

### A.    Kenneth Smith

Smith elected nitrogen hypoxia but challenged the method on two grounds. First, Smith and multiple experts asserted that due to Smith's PTSD, he would vomit in the mask during the execution and then choke to death on his vomit before dying of hypoxia. *See, e.g.*, *Smith v. Hamm*, 2:23-cv-00656, 2024 WL 262867, at *1 (M.D. Ala. Jan. 24, 2024). Second, Smith and one of his experts, Dr. Philip Nitschke, asserted that ADOC's mask would not produce a tight seal. *Smith v. Hamm*, 2:23-cv-00656, 2024 WL 116303, at *18 (M.D. Ala. Jan. 10, 2024). Finding each risk highly speculative, the district court denied Smith's motion for preliminary injunction. *Id.* at *20. The Eleventh Circuit affirmed, and the Supreme Court denied certiorari. *Smith v. Comm'r*, 24-10095, 2024 WL 266027 (11th Cir. Jan. 24, 2024); *Smith v. Hamm*, 144 S. Ct. 414 (2024) (mem.). Smith was executed on January 25, 2024.

### B.    Alan Miller

The State sought Miller's execution warrant on February 21, 2024. Miller, too, challenged nitrogen hypoxia despite having elected it. Among other things, he argued that "a trained medical professional" should place and hold the mask, supervise the flow of nitrogen, and respond if anything "goes awry." Complaint ¶193, *Miller v. Marshall*, 2:24-cv-197 (M.D. Ala. Mar. 29, 2024), DE1. Miller alleged that the mask would not fit his large face, that ADOC should use "medical grade nitrogen," and that a "tranquilizing medication in pill form" would "reduce thrashing."

*Id.* In an order dismissing two counts but permitting Miller's Eighth Amendment claim to proceed, the district court found the surviving allegations to be "noticeably lean on factual detail" and "barely…plausible." *Miller v. Marshall*, 2:24-cv-00197, 2024 WL 2946093, at *7 (M.D. Ala. June 11, 2024).

Miller sought preliminary injunctive relief and received copious discovery. He had a team of two major law firms and Dr. Phillip Bickler, an anesthesiologist who conducts hypoxia studies to test pulse oximeters but does not take participants below seventy percent blood oxygen saturation (a far cry from the ADOC protocol). *E.g.*, Hearing Transcript at 192:5–8, *Boyd v. Hamm*, 2:25-cv-00529 (M.D. Ala. Sept. 4, 2025), DE83. Miller received access to ADOC personnel and documents and deposed nearly ten witnesses. He ultimately settled with the State and dismissed his lawsuit. *See* Joint Stipulation of Dismissal, *Miller v. Marshall*, 2:24-cv-00197 (M.D. Ala. Aug. 5, 2024), DE79. Miller was executed on September 26, 2024.

### C.    Carey Grayson

After the State moved for Grayson's execution, he challenged ADOC's hypoxia protocol in June 2024. *See* Complaint, *Grayson v. Hamm*, 2:24-cv-00376 (M.D. Ala. June 28, 2024), DE1. Grayson alleged that with "proper administration," nitrogen hypoxia would cause an inmate to "lose consciousness within seconds" and die within "minutes" without any "pain or discomfort." *Id.* ¶101. But ADOC's protocol would result in "unconstitutional pain," he claimed, because (1) the inmate

would not be rendered unconscious prior to the administration of nitrogen gas, caus-ing "anguish," *id.* ¶¶105, 111; (2) excess oxygen might enter the mask and prolong the execution, *id.* ¶119; (3) the protocol does not call for a medical examination to diagnose issues like sleep apnea that could prolong the execution, *id.* ¶125; and (4) the execution team is unqualified to monitor the pulse oximeters and EKGs used during the execution, *id.* ¶¶128, 129. Grayson later amended his complaint, alleging that Smith's autopsy suggested negative pressure pulmonary edema (NPPE). Amended Complaint, *Grayson v. Hamm*, 2:24-cv-376 (M.D. Ala. Aug. 30, 2024), DE42.

Grayson moved for a preliminary injunction and received limited expedited discovery. Motion for Preliminary Injunction, *Grayson v. Hamm*, 2:24-cv-00376 (M.D. Ala. Aug. 20, 2024), DE30; Order, *Grayson v. Hamm*, 2:24-cv-00376 (M.D. Ala. Sept. 18, 2024), DE62. The district court held a comprehensive two-day hearing on Grayson's motion. The court received over fifty exhibits, including numerous case reports and articles on inert gas asphyxiation and media reports describing the Smith and Miller executions. *Grayson*, 2024 WL 4701875, at *3. The court heard live testimony from ten witnesses, including each side's expert, the medical exam-iner who conducted Smith's autopsy, and multiple State employees who witnessed the Smith and/or Miller executions. *Id.* at *4–6. The court denied Grayson's motion for a preliminary injunction, finding that his claim fell "well short" of the Eighth

Amendment standard; Grayson presented "a speculative parade of highly unlikely events," *id.* at *19, and the State's expert, Dr. Joseph Antognini, was deemed "more credible and persuasive" than Grayson's expert Dr. Brian McAlary, *id.* at *22. The Eleventh Circuit affirmed unanimously in a published opinion, *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894 (11th Cir. 2024), the Supreme Court denied certiorari, *Grayson v. Hamm*, 145 S. Ct. 586 (2024) (mem.), and Grayson was executed on November 21, 2024.

### D.    Demetrius Frazier

Like Grayson, Frazier waited until the State moved for his execution to challenge the hypoxia protocol in November 2024. Complaint, *Frazier v. Hamm*, 2:24-cv-732 (M.D. Ala. Nov. 15, 2024), DE1. His complaint relied heavily on allegations of what lay witnesses reported about the executions of Smith and Miller. Other than his alternative methods, his complaint was substantially similar to Grayson's.

The district court held a hearing on Frazier's motion for preliminary injunction in January 2025, at which the court heard testimony from Dr. McAlary, Dr. Antognini, and Commissioner Hamm. The court denied Frazier's motion for preliminary injunction, finding the lay witness accounts "insufficiently reliable," *Frazier v. Hamm*, 2:24-cv-00732, 2025 WL 361172, at *11 (M.D. Ala. Jan. 31, 2025) (crediting Dr. Antognini over Dr. McAlary); *id.* at *11 n.20 (noting that "the State

present[ed] credible evidence that Smith held his breath during his execution, thereby prolonging it"); and ultimately finding:

> On this record, Frazier has not established that the Protocol very likely causes needless psychological suffering, superadds psychological pain, or creates a substantial risk of serious psychological harm. While the Court does not doubt that Frazier likely will experience some psychological pain before and during his execution, the Court finds that Frazier has failed to meet his burden to show that the Protocol creates a substantial risk of serious psychological harm over and above what is inherent in any execution. Consequently, Frazier fails to establish a substantial likelihood of success on the merits of his Eighth Amendment claim.

*Id.* at *12. Frazier did not appeal, and he was executed on February 6, 2025.

### E.    Gregory Hunt

Gregory Hunt timely elected nitrogen hypoxia, and the State moved to authorize his execution in March 2025. Hunt never challenged hypoxia; he instead filed two "pro se" successive Rule 32 petitions in state circuit court and a stay application in the United States Supreme Court, which was denied. *Hunt v. Alabama*, No. 24A1192 (U.S. June 10, 2025) (mem.). Hunt was executed on June 10, 2025.

### F.    Geoffrey West

Geoffrey West timely elected nitrogen, and the State moved to authorize his execution in April 2025. He never challenged hypoxia, instead limiting his litigation to claims in response to the State's execution motion that Rule 8(d)(1) of the Alabama Rules of Appellate Procedure was unconstitutional and that the Attorney

13

General had no role in the execution authorization process. West was executed on September 25, 2025.

### G.    Jessie Hoffman (Louisiana)

Finding that no drug company would sell Louisiana the necessary drugs for lethal injection, that state made nitrogen hypoxia its method of execution in spring 2024. Jessie Hoffman waited until February 2025, after Louisiana issued a death warrant, to bring a new lawsuit challenging nitrogen hypoxia. The parties engaged in expedited discovery, and the district court held an evidentiary hearing, featuring testimony from Dr. Antognini and Dr. Bickler. The district court found that "nitrogen hypoxia does not produce physical pain" and that a person breathing nitrogen would "lose consciousness in less than one minute." *Hoffman v. Westcott*, 3:25-cv-00169, 2025 WL 763945, at *8 (M.D. La. Mar. 11, 2025). The court enjoined Hoffman's execution, however, on its "common sense [belief] that the deprivation of oxygen to the lungs causes a primal urge to breathe and feelings of intense terror." *Id.* at *9. That alleged "psychological pain," which the court never compared to the baseline emotional distress of facing execution or the distress posed by any alternatives, was enough to find that Hoffman had "clearly shown" a "substantial likelihood of success on his Eighth Amendment claim. *Id.* at *10.

The Fifth Circuit swiftly reversed, explaining that the preliminary injunction was "not just wrong" but got "the Constitution backwards, because it's premised on

the odd notion that the Eighth Amendment somehow requires Louisiana to use an admittedly *more* painful method of execution." *Hoffman v. Westcott*, 131 F.4th 332 (5th Cir. 2025). The Supreme Court denied Hoffman's stay application. *Hoffman v. Westcott*, 145 S. Ct. 797 (2025) (mem.). Hoffman was executed on March 18, 2025.

ARGUMENT

Taylor's complaint names two defendants, ADOC Commissioner John Q. Hamm and Warden Terry Raybon. As to both, Taylor fails to state a claim for which relief may be granted.

## I.    Count I (Eighth Amendment) should be dismissed for failure to state a claim.

In Count I (DE1 ¶¶175–99), Taylor contends that ADOC's nitrogen hypoxia execution protocol is cruel and unusual. He claims that the protocol "creates a substantial risk of unconstitutional superadded pain and terror, through conscious suffocation during executions," *id.* ¶185, asserting that the previous hypoxia executions demonstrate that it "is agonizingly painful," *id.* ¶186. Taylor also claims that the protocol does not include any provision for a sedative prior to the nitrogen, *id.* ¶188, that it does not include a safeguard against the risk of vomiting, *id.* ¶189, that it does not protect against "the risk of asphyxiation-induced injury" that would leave the inmate brain-dead but alive *id.* ¶¶190–92, that it does not require that the mask be properly fitted to the inmate's face, *id.* ¶¶193–94, and that it "does not account for residual oxygen" in the tubing, *id.* ¶¶195–96. Taylor further claims that the protocol

is unusual "because it is new to the common law system and amounts to human experimentation." *Id.* ¶198.

Taylor has failed to state an Eighth Amendment claim, and Count I should be dismissed.

### A.    Law of method-of-execution claims.

The Eighth Amendment forbids "cruel and unusual punishments," such as "burning at the stake, crucifixion. breaking on the wheel, or the like." *In re Kemmler*, 136 U.S. 436, 446 (1890). A claim that a method falls in that category must meet an "extremely demanding standard," *Smith*, 144 S. Ct. at 416 (Kagan, J., dissenting), an "exceedingly high bar" that no method-of-execution claim has ever surpassed in the Supreme Court, *Barr v. Lee*, 591 U.S. 979, 980 (2020); *accord Glossip*, 576 U.S. at 869. The inquiry "ask[s] whether the punishment 'superadds' pain well beyond what's needed to effectuate a death sentence." *Bucklew v. Precythe*, 587 U.S. 119, 137 (2019). "States have often sought more nearly the opposite,' developing new methods, such as lethal injection, thought to be less painful and more humane than traditional methods, like hanging, that have been uniformly regarded as constitutional for centuries." *Lee*, 591 U.S. at 980 (citation omitted); *accord Barber v. Governor of Ala.*, 73 F.4th 1306, 1318 (11th Cir. 2023).

***First***, Taylor must plead that nitrogen hypoxia poses a "substantial risk" of "severe pain over and above death itself." *Nance*, 597 U.S. at 164. That severe pain

must be "sure or very likely" to occur. *Glossip*, 576 U.S. at 877; *accord Price v. Comm'r, Ala. Dep't of Corr.*, 920 F.3d 1317, 1325-26 (11th Cir. 2019). The Constitution "does not guarantee a prisoner a painless death" or even a quick one. *Bucklew*, 587 U.S. at 132.

**Second**, Taylor must plead "an alternative that is 'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.'" *Glossip*, 576 U.S. at 877. A "comparative exercise" is required to "decide whether the State has cruelly 'superadded' pain to the punishment of death." *Nance*, 597 U.S. at 164. Taylor's alternative must provide "the State a pathway forward," such as "a veritable blueprint for carrying the death sentence out." *Id.* at 169. Taylor also must show "that the State has refused to adopt [an alternative] without a legitimate penological reason"—i.e., the State has cruelly "chosen" to "superadd[] pain to the death sentence." *Bucklew*, 587 U.S. at 134. Among reasons not to adopt an alternative protocol are inability to secure necessary drugs, the necessary involvement of individuals unable to participate in an execution due to professional ethical restrictions, and the state's interest in selecting a method of execution that "preserv[es] the dignity of the procedure." *Id.* at 134-35 (collecting cases).

**Third**, even if Taylor's complaint satisfies the test just discussed, he still must plausibly allege that the method was "calculated to superadd terror, pain, or disgrace." *City of Grants Pass v. Johnson*, 603 U.S. 520, 542 (2024) (citation

modified).[2] To show the method "cruelly superadds pain," *Bucklew*, 587 U.S. at 133, Taylor must plead plausible facts that would prevent "prison officials from pleading that they were 'subjectively blameless,'" *Glossip*, 576 U.S. at 877.

As was noted earlier this year in a similar challenge, Taylor's "claim 'faces an exceedingly high bar.'" *Frazier*, 2025 WL 361172, at *9 (quoting *Barr*, 591 U.S. at 980). The opinion continued:

> Frazier's claim cannot succeed unless he establishes that the Protocol "presents a risk that is *sure or very likely* to cause serious illness and needless suffering" and also "gives rise to sufficiently *imminent* dangers." *Grayson*, 121 F.4th at 897 (emphases in original) (quoting *Price*, 920 F.3d at 1325). The Protocol must pose a "'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Glossip*, 576 U.S. at 877 (quoting *Baze* [*v. Rees*, 553 U.S. 35, 50 (2008)]). To date, the United States Supreme Court "has yet to hold that a State's method of execution qualifies as cruel and unusual." *Bucklew*, 587 U.S. at 133.

*Id.*

## B.    Taylor does not plausibly allege a substantial risk of severe pain in Count I.

Taylor claims that the hypoxia protocol is cruel and unusual because it "creates a substantial risk of unconstitutional superadded pain and terror, through conscious suffocation during executions," DE ¶185, an allegation built largely on lay

---

2. *Grants Pass* was not a method-of-execution case, but it is offered to illustrate the Supreme Court's consistent articulation of the constitutional standard.

witness observations of the previous hypoxia executions, *see id.* ¶ 186. He further argues:

- the protocol does not contain a provision for sedation prior to the nitrogen, *id.* ¶188,

- the protocol does not contain safeguards against vomiting in the mask and choking, *id.* ¶189,

- the protocol does not contain safeguards against asphyxiation-induced injury, including the risk that the nitrogen were to stop while the inmate were still alive, *id.* ¶¶190–92,

- the protocol does not require that the mask be properly fitted to the condemned's face, *id.* ¶¶193–94, and

- the protocol makes no provision for residual oxygen that may be in the system's tubing, *id.* ¶¶195–96.

These will be addressed in turn.

### i.    "Conscious suffocation."

Turning first to the claim of conscious suffocation, Taylor alleges, "Depriving a conscious person of oxygen creates a 'constitutionally unacceptable risk of suffocation.' *Baze*, 553 U.S. at 53." DE1 ¶139. Aside from the fact that Taylor is quoting dicta from the plurality opinion of *Baze*, the method of execution at issue in *Baze* was completely different. There, the Supreme Court was discussing (and not evaluating, because they were uncontested) the risks of pancuronium bromide, which "inhibits all muscular-skeletal movements and, by paralyzing the diaphragm, stops respiration." 553 U.S. at 44. That does not happen with nitrogen hypoxia (and Taylor

has not pleaded that it does). He never explains how the alleged source of his terror and pain could be anything like having one's diaphragm paralyzed. There are more or less painful ways (and even *painless* ways) that one can be deprived of oxygen while conscious, so merely observing that a method of execution involves deprivation of oxygen is not enough to state an Eighth Amendment claim. *See, e.g.*, *In re Ohio Execution Protocol Litig.*, 946 F.3d 287, 290 (6th Cir. 2019).

Taylor mainly relies on witness accounts of movement during the previous hypoxia executions to support his allegations that the deprivation of oxygen in those executions was painful. *See* DE1¶¶71–122. But he never confronts more likely causes of movement, including voluntary resistance (in the case of Smith and Grayson) or involuntary movements associated with dying, which can be "misperceived as signs of consciousness or distress." *Baze*, 553 U.S. at 57; *accord Grayson*, 2024 WL 4701875, at *4, 6, 17, 20 (discussing evidence of Smith's resistance, consumption of an illegal drug before his execution, holding his breath, agonal breathing after unconsciousness, that even "brain-dead patients experience movement," etc.). On motion to dismiss, the Court need not credit any of these explanations. But neither must the Court accept allegations that are not "plausible" "given more likely explanations." *Iqbal*, 556 U.S. at 681. Taylor has offered a version of events that is no more than "merely consistent," *id.* at 678, with what some (mistaken) journalists

said. All of this was litigated in *Grayson v. Hamm*, a case that should not have survived motion to dismiss, either.

Taylor restates earlier plaintiffs' observation that the Smith autopsy noted "pulmonary edema," which is a swelling of the lungs. DE1 ¶¶91–93. But Taylor's inference that there was "negative pressure" on Smith's airway (from what?) or an "upper airway…obstruct[ion]" (from what?) are wholly conclusory and speculative. *Id.* The allegation appears to be that an inmate "experiencing panic" (why?) and "sensing an inability to breathe" (how?) will have his airway close up entirely. *Id.* ¶93 Taylor offers no allegation that panic-induced airway closure causing painful and prolonged suffocation has ever happened to anyone, and it is not plausible that it could happen to him. At a certain point, such confusing, elliptical, and hypothetical allegations—even if Taylor could find some expert to repeat them—should not proceed.[3]

---

3. Taylor, like Grayson, Frazier, and Boyd before him, claims that Smith's autopsy results specifically establish he suffered from **negative pressure** pulmonary edema ("NPPE"). *Id.* ¶91. As was noted in *Grayson*, Dr. McAlary, asserting signs of NPPE in Smith's autopsy, "finds himself without any real foundational support other than an unsupported opinion—no supporting articles or case studies, reliance upon highly questionable hearsay witness accounts, no support in Smith's autopsy report for an upper airway obstruction that led to negative pressure pulmonary edema, untested reliance on proposed alternatives with their own set of risks and complications, unfounded theories of risks of mask leaks or monitoring device failures, and unfounded theories that the execution team cannot adequately monitor pulse oximeter or EKG devices or make the simple interpretations intended from them." *Grayson*, 2024 WL 4701875, at *22.

### ii.    Sedation prior to nitrogen.

Taylor is correct that the hypoxia protocol does not include a provision for the administration of a sedative before the nitrogen is turned on. *See* DE1 ¶¶50, 188. But nowhere does he plead facts showing that a sedative is constitutionally necessary, nor does he plead what sedative the constitution mandates that he receive. Indeed, if the sedative Taylor requests slows his breathing, it may prolong his execution.

If a mild sedative is therapeutically warranted, then Taylor may request such from ADOC's contract medical provider. *See Grayson*, 2024 WL 4701875, at *4, 20.

### iii.    Risk of vomiting and aspiration.

Taylor claims that the protocol is unconstitutional because it contains no provision for the (unlikely) event that the condemned vomits in the mask and aspirates. *See* DE1 ¶189. Here, Taylor offers no plausible facts to show that this has been a problem in previous executions. The potential of vomiting and subsequent aspiration was a claim in the Smith § 1983 litigation, and a representative of ADOC testified "that the execution team would remove and clean the mask and check and clean Smith's airway if Smith vomited *before* nitrogen was introduced into the mask. She also testified that the team would not halt the execution if Smith vomited *after* nitrogen was introduced into the mask." *Smith*, 2024 WL 116303, at *19. As was noted later that year in *Grayson*, "Smith claimed that "the Protocol…subject[ed] him to a

'substantial risk of asphyxiation on his own vomit," *Smith*, 2024 WL 116303, at \*17 (citation omitted), and his medical expert characterized that as an almost certainty. But that certainty never happened. Nor did it happen with the Miller execution." *Grayson*, 2024 WL 4701875, at \*19 n.20.

If Taylor is genuinely concerned about vomiting and aspiration, then, like Smith, he may have his last meal earlier in the day so as to ensure he does not have a full stomach at the time of execution. *See, e.g.*, Abigail Brooks, Erik Ortiz & Dasha Burns, *Alabama Inmate Kenneth Smith Put to Death in First U.S. Nitrogen Gas Execution*, NBC NEWS (Jan. 25, 2024, 9:43 PM), https://www.nbcnews.com/news/us-news/alabama-prepares-first-us-nitrogen-gas-execution-inmate-kenneth-smith-rcna135568 ("Prison officials said earlier that as a precaution to Smith's vomiting, they gave him his final meal of solid food by 10 a.m. and only clear liquids throughout the day.").

### iv.    Risk of asphyxiation-induced injury.

Taylor claims that there are no provisions in the protocol to protect him against an "asphyxiation-induced injury" that could leave him alive but brain dead. DE1 ¶190. Causes for such an injury could, he alleges, be "[i]nadequate delivery of nitrogen gas or delivery of insufficiently pure nitrogen gas," or shutdown of the nitrogen while he is still alive. *Id.* ¶191.

Taylor offers no plausible facts to show that inadequate gas, impure gas, or premature shutdown have been a problem in previous executions. Moreover, as the State has an interest in carrying out judicial executions, ADOC has every incentive to ensure that the inmate is breathing pure nitrogen[4] and that enough nitrogen is present to kill the condemned. Further, the protocol specifies that there must be at least 500 PSI of nitrogen and breathing air for an execution,[5] and Taylor pleads no facts showing that this would be insufficient.

### v.    Fitting the mask.

Taylor alleges that the protocol is defective because it does not require that the mask be properly fitted to the face of the condemned. DE1 ¶193–94. Putting aside for the moment the fact that such a fitting would require the cooperation of the inmate prior to the execution—hardly a guarantee—Taylor has pleaded no facts showing that the full-face respirator used in the previous executions was improperly fitted to any of the previous inmates' faces, from Miller's large face to Grayson's considerably smaller one.[6] He also failed to plead facts showing that mask fit has

---

4. Purity analysis certificates for the nitrogen have been submitted in federal litigation. *See, e.g.*, *Grayson*, 2024 WL 4701875, at *3.

5. ALA. DEP'T OF CORR. EXECUTION PROCS. 38 (Aug. 2023), https://alabamareflector.com/wp-content/uploads/2023/09/Alabama-death-penalty-protocol.pdf.

6. *Compare, e.g.*, Ivana Hrynkiw, *Alabama Inmate Alan Miller Executed With Nitrogen Gas Thursday for 1999 Shootings*, AL.COM (Sept. 26, 2024, 12:00 PM), https://www.al.com/news/2024/09/alabama-inmate-alan-miller-set-to-be-executed-with-nitrogen-gas-thursday-for-1999-shootings.html    (showing    Miller)

been a problem in any hypoxia execution or that the flow rate is low enough to make an amount of oxygen sufficient to prolong the execution enter the mask.

### vi. Residual oxygen.

Finally, Taylor claims that the protocol is defective because it does not contain any provisions for dealing with "residual oxygen that may remain in the tubing and other parts of the nitrogen execution system," *id.* ¶195, which he claims "increases the risk of a long, painful, terrifying execution," *id.* ¶196. Under the protocol, the inmate begins the execution with breathing air, which obviously contains oxygen, flowing into the mask. There will thus be *some* oxygen in the delivery system at the beginning of the execution, but once the breathing air is shut off and the nitrogen is turned on in its stead, it will quickly be flushed. Taylor has failed to plead facts showing that his hypothetical residual oxygen has ever prolonged an execution.

### C. Defects of Taylor's alternative methods of execution cause Count I to fail as a matter of law.

Taylor must plead and "prove a known and available alternative," *Glossip,* 576 U.S. at 880, that the State has "refuse[d] to adopt" despite "documented advantages," *Baze*, 553 U.S. at 52. The alternative must allow the State to carry out the sentence "relatively easily and reasonably quickly." *Bucklew,* 587 U.S. at 141. This

---

with Kent Faulk, *Alabama Executes Carey Dale Grayson by Nitrogen Gas for 1994 Murder*, AL.COM (Nov. 21, 2024, 10:49 AM), https://www.al.com/news/2024/11/live-updates-alabama-set-to-execute-carey-dale-grayson-by-nitrogen-gas-for-1994-murder.html (showing Grayson).

standard is extraordinarily high. *See Barber*, 73 F.4th at 1318. A plaintiff cannot *force* States to "experiment" with new methods, *Bucklew*, 587 U.S. at 142, or adopt a method to reduce risk "slightly," *Baze*, 553 U.S. at 51. Rather, the Eighth Amendment comes into play only when the state rejects an alternative with "comparative efficacy" so "well established" that "failure to adopt it" makes officials subjectively blameworthy. *Id.* at 57; *accord Bucklew*, 587 U.S. at 142. The standard is not an invitation to toss out a hypothetical method with gaps so large that it is unclear whether or how the state would implement it, leaving room for yet another challenge. *See Bucklew*, 587 U.S. at 141-42; *Nance,* 597 U.S. at 169; *see also Hamm v. Smith*, 143 S. Ct. 1188, 1189 (2023) (Thomas, J., dissenting from denial of certiorari).

### i.    Modified hypoxia protocol.

Taylor's first alternative is a modified version of ADOC's hypoxia protocol crossed with a lethal injection. DE1 ¶¶146–59.

- Taylor must be examined by a physician for upper airway obstruction or "any anxiety disorders, including claustrophobia." *Id.* ¶146. The physician's examination will also include a mask fitting. *Id.*

- Taylor will be put on the gurney in full view of his witnesses. *Id.* ¶147.

- "IV lines will be connected" to Taylor "consistent with lethal injection executions." *Id.* ¶148. EKG leads will also be placed on him, and the EKG machine will be left in the witnesses' sight. *Id.* ¶149.

- Before and after his final statement, Taylor will be ministered to by his spiritual advisor. *Id.* ¶151.

- After his final statement, Taylor will receive an IV injection of midazolam "sufficient to render [him] unconscious." *Id.* ¶152. Five minutes later, there will be a consciousness check just like the one used in lethal injections. If Taylor is still conscious, he will receive a second dose. If he is conscious after a second consciousness check, "the execution will be postponed for a full medical assessment and determination of what, if anything, went wrong." *Id.* ¶¶154–56.

- If Taylor is unconscious, the mask will be placed on him, and the execution will proceed as in the current protocol. *Id.* ¶157.

- Once the EKG indicates that Taylor is dead, the leads will be verified as working correctly. *Id.* ¶158.

- Once a physician pronounces time of death, the nitrogen can be turned off, but the mask must remain on for an additional minute. *Id.* ¶159.

This protocol is not feasible, readily available, and significantly safer than the current execution protocol, and ADOC has penological reasons not to adopt Taylor's suggestions.

*First*, Taylor has failed to identify a qualified medical professional willing to participate in an execution in the capacity he requires. Medical professionals who work for YesCare, ADOC's contract provider of services to inmates, do not participate in executions in accordance with the National Commission on Corrective Health Care's standards. The AMA Code of Medical Ethics prohibits physician participation in execution, including to the extent that the physician "[w]ould assist, supervise, or contribute to the ability of another individual to directly cause the death of the condemned." Opinion 9.7.3, AMA CODE OF MED. ETHICS, https://code-

27

medical-ethics.ama-assn.org/ethics-opinions/capital-punishment (last visited Sept. 19, 2025).[7]

***Second***, during a lethal injection, the individuals who establish IV access always do so before the witnesses arrive to protect their privacy. Allowing witnesses to watch while Taylor's IVs were established would risk the identities of these individuals being released, a risk to ADOC security and Alabama's ability to carry out executions.

***Third***, Taylor seeks to have his entire modified hypoxia protocol be conducted with the curtains open and in full view of the statutory witnesses. Alabama has a legitimate penological reason to preserve the dignity of the execution by keeping the curtains closed until the preparations are complete and the execution is ready to proceed.

***Fourth***, Taylor does not identify how much midazolam he should be given to render him unconscious but not kill him. Even if he had, ADOC has not attempted to execute anyone with a combination IV drug–hypoxia protocol, and there is no reason for ADOC to add one of the complicating factors of lethal injection—reliably establishing IV lines—to a non-drug execution method. Moreover, if midazolam

---

7. Taylor has also failed to plead any facts showing why a medical professional would have any expertise in supervising the placement of a full-face respirator, which is not a piece of equipment used in medical practice.

28

slows Taylor's breathing, it may prolong his execution. As was noted in *Grayson*, "there are potential side effects with midazolam including airway obstruction and an increased risk of negative pressure pulmonary edema and nausea." *Grayson*, 2024 WL 4701875, at *6; *see Bucklew*, 587 U.S. at 142 ("[A]n entirely new method" or mere "proposal for more research" presents the State with "a 'legitimate' reason for declining to switch from its current method of execution."). "[C]hoosing not to be the first to experiment with a new method of execution is a legitimate reason to reject it." *Bucklew*, 587 U.S. at 142. Because the Eighth Amendment "does not compel a State to adopt 'untried and untested' (and thus unusual in the constitutional sense) methods of execution," Taylor's complaint fails to state an Eighth Amendment claim upon which relief may be granted. *Id.*

### ii.    MAID.

Taylor's second alternative is MAID, specifically secobarbital or DDMP II (that is, diazepam, digoxin, morphine sulfate, and propranolol). DE1 ¶¶160–74. While MAID is authorized for euthanasia in eleven states and Washington, D.C.,[8] it is not an approved method of execution in any state. He claims that Dr. Charles Blanke, an Oregon physician, provided in an affidavit in an earlier case that patients who take these drugs "lose consciousness within about five minutes and die within

---

8. *States Where Medical Aid in Dying is Authorized*, COMPASSION & CHOICES, https://compassionandchoices.org/states-where-medical-aid-in-dying-is-authorized (last visited Sept. 22, 2025).

about twenty-five minutes." *Id.* ¶173. MAID is not feasible or readily available to ADOC as a matter of law, nor does Taylor offer the Court anything resembling "a veritable blueprint" for its use. *Nance*, 597 U.S. at 169.

***First***, Taylor claims that the drugs should be introduced to the inmate by oral injection. DE1 ¶165. Aside from the obvious problem that this method requires the inmate to ***swallow*** the lethal agents, it does not specify what happens if the inmate chooses not to cooperate. If "oral injection" is taken to mean a feeding tube, this would require the participation of a doctor, and Taylor cannot identify one willing to insert the equipment and push the lethal drugs.

***Second***, Taylor has not pleaded facts showing that any of the drugs in the DDMAPh cocktail are available to ADOC ***for use in an execution***. Even if ADOC's contract provider can procure some or all of the drugs to use for inmate medical purposes, that does not make them available for use as a method of execution. It is no secret that pharmaceutical manufacturers have put pressure on state departments of corrections to not use their products in executions; sodium thiopental was pulled from the U.S. market entirely as a result of pressure from death penalty abolitionists and the Italian government. *Glossip*, 576 U.S. at 869-72 (discussing lethal injection progression from sodium thiopental to pentobarbital, then to midazolam). As a matter of law, Alabama has a legitimate penological reason not to adopt such methods that "depend so heavily on external variables," *Frazier*, 2025 WL 361172, at *13,

because "the question of capital punishment belongs to the people and their representatives," *Bucklew*, 587 U.S. at 150, not activists and drug companies, *cf. Price*, 920 F.3d at 1327 (noting that no "supply concerns exist for nitrogen," which "is easily purchased").

*Third*, despite Taylor's citation to Dr. Blanke's affidavit, a MAID death is not always quick. A 2025 study reviewing various drug cocktails found that of 383 secobarbital suicides, the mean time to sleep was 5.7 minutes and the mean time to death was 1 hour, but death could take as long as 27 hours. For DDMP II, of 432 suicides, the mean time to sleep was 9.2 minutes and the mean time to death was 3.5 hours, with the maximum time to death recorded at 61.8 hours. Patrick Macmillan et al., *The Pharmacology of Aid in Dying: From Database Analyses to Evidence-Based Best Practices*, 28:4 J. PALLIATIVE MED. 492–98 (2025).

As neither of Taylor's alternatives is feasible, readily available, and significantly safer than the current nitrogen hypoxia protocol, Count I is due to be dismissed.

## II. Count II (state-law constitutional challenge) should be dismissed for failure to state a claim.

Count II (DE1 ¶¶200–05) is a state-law claim, as Taylor contends that the hypoxia protocol is cruel or unusual under Article I, section 15 of the Alabama Constitution for the reasons previously discussed.

31

First, all Defendants have sovereign immunity in federal court against a "claim of entitlement to relief [that] is based on a violation of state law." *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1204 (11th Cir. 2019). Federal courts cannot "instruct[] state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). "And conclusory allegations that the same conduct that violates state law also violates the U.S. Constitution will not boost the claim over the sovereign-immunity bar." *S&M Brands*, 925 F.3d at 1204. Sovereign immunity applies equally to a "prayer for declaratory relief [that] adds nothing to the prayer for injunction." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002). As plaintiffs seek relief against state officers for alleged violations of state law, their claims are due to be dismissed under *Pennhurst* and its progeny for lack of subject-matter jurisdiction. *See Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 541 (2002) ("[W]e cannot read § 1367(a) to authorize district courts to exercise jurisdiction over claims against nonconsenting States[.]").

Second, as Taylor's corresponding federal claim, Count I, is due to be dismissed, this Court should decline to exercise supplemental jurisdiction over Count II. While this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a),[9]

---

9. "[I]n any civil action in which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that…form part of the same case or controversy[.]"

the Court is not obligated to exercise that jurisdiction, particularly here, where there is minimal guiding state authority and where the federal-law claims are ripe for dismissal.

While Alabama courts have held that "lethal injection is not per se cruel and unusual punishment," *e.g.*, *McNabb v. State*, 991 So. 2d 313, 335 (Ala. Crim. App. 2007) (collecting cases), the appellate courts' only statement on nitrogen hypoxia in this context to date appears in *Smith v. State*, a Rule 32 action in which Kenneth Smith argued that permitting him to be executed after his first execution was called off would be unconstitutional:

> In addition, in Alabama, "[a] death sentence shall be executed by lethal injection, unless the person sentenced elects to be executed by electrocution or nitrogen hypoxia." § 15-18-82.1(a), Ala. Code 1975. In his reply brief, Smith asserts that the State has "moved to execute [him] using [nitrogen hypoxia]," and in his § 1983 action in federal court, Smith "sufficiently pleaded that nitrogen hypoxia will significantly reduce his pain." *Smith v. Commissioner, Ala. Dep't of Corr.*, No. 22-13781, November 17, 2022 (11th Cir. 2022) (not reported in Federal Reporter). Accordingly, a second attempt at execution will not be cruel and unusual punishment, and his claim to the contrary is without merit.

396 So. 3d 400, 406 (Ala. Crim. App. 2023) (citation omitted).

Moreover, to the extent that Taylor suggests that the Alabama Constitution offers more protection than the United States Constitution—"cruel or unusual" versus "cruel and unusual," *see* DE2 ¶202—this contention has yet to be ruled upon by the appellate bench. It came before ACCA in *Mitchell v. State*, 84 So. 3d 968, 994–95 (Ala. Crim. App. 2016), but that court declined to decide the question because

the claim could be dismissed on other grounds. Assuming arguendo that this claim has merit, this would logically mean that no method of execution could be used in Alabama until it was well established in other jurisdictions. How often a method of execution must be used in order to no longer be "unusual" is not a question Taylor answers, so his claims must be dismissed as conclusory

The better answer here is the one provided in *Bucklew*: that "unusual" punishments should be understood to be those like burning alive and drawing and quartering that had once been used but had long fallen *out* of favor. Moreover, under Alabama law, the punishment is death, not any particular method, *cf.* ALA. CODE §15-18-82.1(e) ("A change in the method of execution shall not increase the punishment or modify the penalty of death for capital murder."), and as the Alabama Supreme Court held in *Lee v. State*, capital punishment is not unusual:

> "[T]he punishment of death" or imprisonment for life is neither unusual nor cruel, within the meaning of the Constitution, where the crime for which punishment is imposed is malevolent and proximately causes the death of a human being, so long as the death inflicted is speedy, and without undue pain or torture.

150 So. 164, 166 (1933) (quoting *In re Kemmler*, 136 U.S. 436 (1890)). As Taylor failed to plead facts showing that execution by nitrogen hypoxia is drawn-out and torturous, this claim is meritless under Alabama law.

Finally, for the reasons discussed as to Count I, *supra*, this claim is due to be dismissed for failure to state a claim.

34

### III. Count III (Due Process) should be dismissed for failure to state a claim.

In Count III (DE1 ¶¶206–16), Taylor alleges that his Fourteenth Amendment right to due process has been violated because Defendants have not given him an unredacted copy of the protocol.

To succeed on a procedural due process claim, Taylor must show "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." *Woods v. Comm'r, Ala. Dep't of Corr.*, 951 F.3d 1288, 1293 (11th Cir. 2020). He fails out of the gate, for "the Eleventh Circuit has held that death row inmates do not have a due process right to disclosure of a state's execution protocol because there is no cognizable liberty interest in such information." *Woods v. Dunn*, 2:20-cv-58, 2020 WL 1015763, at *12 (M.D. Ala. Mar. 2, 2020) (citing *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1293 (11th Cir. 2016); *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1267 (11th Cir. 2014)); *see also Zink v. Lombardi*, 783 F.3d 1089, 1109 (8th Cir. 2015) (agreeing with Fifth and Eleventh Circuits that there is no "freestanding right to detailed disclosure" of state's execution protocol); *Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir. 2014) ("[U]ncertainty as to the method of execution is not a cognizable liberty interest."); *Sepulvado v. Jindal*, 729 F.3d 413, 420 (5th Cir. 2013) ("There is no violation of the Due Process Clause from the uncertainty that Louisiana has imposed on Sepulvado by withholding the details of its execution protocol.").

Moreover, Taylor, like all death-row inmates, was provided a redacted copy of the execution protocol in late August 2023.[10] The protocol is redacted for security purposes, but it explains how a nitrogen hypoxia execution will proceed:

- After a final visual inspection of the system by the Warden or Assistant Warden, breathing air will be allowed to flow to the mask.

- The condemned will be taken to the execution chamber and restrained on the gurney. A pulse oximeter will be placed on him.

- Before the mask is placed on the condemned's face, a member of the Execution Team will use an oxygen meter to ensure that breathing air (instead of pure nitrogen) is flowing into the mask. The mask will then be placed on the condemned's face, the pulse oximeter will be monitored, and the Team Captain will verify that the mask is properly seated.

- The spiritual advisor will be brought in to minister to the condemned.

- After a check to ensure there are no legal impediments to execution, the Warden will cause the curtains to the witness rooms to be opened. He will enter the chamber and read the warrant. The condemned may then make his final statement.

- The Warden will check again with the Commissioner for any stays of execution before proceeding.

- Team members will make a final inspection of the mask to ensure proper placement.

- The Warden will then activate the nitrogen hypoxia system, causing nitrogen gas (instead of breathing air) to flow into the mask. The nitrogen will be allowed to flow for fifteen minutes or five minutes after flatline on an EKG, whichever is longer.

---

10. Defendants dispute Taylor's claim that he never received a redacted copy. *See* DE1 ¶37.

*Id.* at 16–18. While many of the redactions as to nitrogen hypoxia concern the specifics of the equipment and how it is tested and used (e.g., the location of a sensor, *id.* at 32), the protocol reveals that there are lockout valves, pressure gauges, and a wall-mounted oxygen monitor, *id.* at 32, 35, gas cylinders with valves and pigtail connections, *id.* at 32, manifolds for breathing air and nitrogen banks, *id.* at 33–34, a warning placard, *id.* at 34, a hose, attachment straps, and tubing (in the mask assembly), *id.* at 35, and portable oxygen meters, *id.* Taylor has pleaded no facts explaining what else he would need to know in order to challenge the protocol.

Taylor has no right to know every detail of Alabama's hypoxia protocol where redactions are made for facility security purposes. Thus, this claim is due to be dismissed.

**CONCLUSION**

For the above reasons, Taylor's complaint is due to be dismissed. Further, Defendants oppose the declaratory and injunctive relief Taylor requested.

Respectfully submitted,

Steve Marshall
*Attorney General*

**/s/ Lauren A. Simpson**
Lauren A. Simpson
*Deputy Attorney General*

Polly S. Kenny

37

*Assistant Attorney General*

### CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2025, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system, which will send notification of such filing to counsel of record.


*/s/ Lauren A. Simpson*
Lauren A. Simpson
*Deputy Attorney General*

ADDRESS OF COUNSEL:

Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
Lauren.Simpson@AlabamaAG.gov